*Korey Vaugh Hamilton Payne v. State of Maryland*, No. 1649, September Term, 2017. Submitted on Brief: August 3, 2018.  Opinion by Sharer, J.

**CRIMINAL PROCEDURE – MOTION TO SUPPRESS – MIRANDA PROTECTIONS – VOLUNTARINESS OF POLICE INTERVIEW – CUSTODY**

When asserting a violation of one's rights under *Miranda v. Arizona,* 384 U.S. 436 (1966) and its progeny, it is an appellant's burden to prove that he or she was in custody when engaging in an interview with police.

In this appeal, Payne failed to satisfy his burden of proving a custodial interrogation.  He agreed to speak with police in a bedroom inside his home; he was not forced or coerced to speak with police; he was told that he was not under arrest; he was not restrained or prevented from leaving the bedroom, the interview lasted 45 minutes with only two police officers; the officers used conversational tones; and, after the conclusion of the interview and the search of the home, police left Payne's home without arresting him.

This Court agreed with the suppression court's ruling that Payne was not in custody during his interview with police, and thus, he was not subject to a custodial interrogation. Therefore, *Miranda* protections were inapplicable.

**EVIDENCE – OTHER BAD ACTS – ADMISSIBILITY – IDENTITY EXCEPTION**

In addition to evidence relating to the five charged child pornography images found on a data storage device that was in a box with three other data storage devices, the State offered brief testimony that one of the data storage devices, containing child pornography, also contained a video of Payne setting up a video recorder and masturbating next to a sleeping woman.

The admissibility of other bad acts evidence requires special relevancy and is subject to the *Faulkner* standard, a three-step analysis to:  (1) determine if the evidence falls into a recognized exception; (2) determine whether appellant was involved in the other bad act; and (3) balance whether the probative value of the evidence outweighs the danger of any unfair prejudice.  *State v. Faulkner*, 314 Md. 630, 634–35 (1989).

Payne's defense, asserted during opening statements and in the motion's argument, was that the storage devices were not his but were the property of another resident of the home. The State argued in satisfaction of the first prong that the testimony of the uncharged images and private video went to the identity exception, to show the jury Payne's identity and ownership of the data storage devices containing both child pornography and his personal non-child pornography images.  Payne conceded that the existence of the video would satisfy the second prong.

This Court found the trial court's ruling concerning relevance and the identity exception sufficient when it permitted the brief testimony of the video's existence, but prohibited the State from displaying to the jury the video or image captured from the video.

**CRIMINAL LAW – STATUTORY INTERPRETATION – LEGISLATIVE INTENT – UNIT OF PROSECUTION**

When determining the Legislature's intended unit of prosecution for violations of a criminal statute, we review the plain language of the statute and explore the statutory structure and legislative history.

The plain language of Criminal Law Article § 11-208(a)(2) (2012) proscribes that "[a] person may not knowingly possess and intentionally retain a … visual representation showing an actual child under the age of 16 years: … engaged in sexual conduct[.]" This Court determined that the statute was clear and unambiguous in proscribing each instance of possession. Nonetheless, this Court found support from the statutory construction, legislative history, and relevant case law from this State and other jurisdictions.

This Court found significant the Legislature's use of the term "a" throughout the statute, qualifying each reference to a proscribed item in the singular, and its use of the phrase "actual child," denoting the importance of each singular child victim. As a result, this Court concluded that each instance of possession of an image of child pornography, as proscribed by CR § 11-208, is a discrete and independent offense and, therefore, subject to separate punishment.

**CRIMINAL LAW – SENTENCING – UNIT OF PROSECUTION – RULE OF LENITY**

When a statute is clear and unambiguous, the rule of lenity does not apply. Because Criminal Law Article § 11-208(a)(2) (2012) was clear and unambiguous as to the Legislature's intended unit of prosecution for violations of the statute, each of Payne's five convictions and sentences for possession of the five charged child pornography images of different child victims were affirmed.

Circuit Court for Anne Arundel County
Case No. C-02-CR-16-002447

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1649

September Term, 2017

_____


KOREY VAUGH HAMILTON PAYNE

v.

STATE OF MARYLAND

_____

Graeff,
Arthur,
Sharer, J., Frederick
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Sharer, J.

_____

Filed: December 18, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Having been charged with, and convicted of, five counts of possession of child pornography,[1] Korey Vaugh Hamilton Payne raises three challenges to rulings of the Circuit Court for Anne Arundel County.[2]

In his brief, Payne asks:

1. Did the motions court err in denying [his] motion to suppress his statement?

2. Did the circuit court err, or abuse its discretion, in admitting other bad acts evidence?

3. As a matter of first impression in Maryland, did the circuit court err in imposing separate sentences for each of five images of child pornography where each image was possessed at the same time and place?

Finding neither error nor abuse of discretion by either the motions court or the trial court, we affirm the judgments of the Circuit Court for Anne Arundel County.

---

[1] Payne was charged by information with five counts under Md. Code (2002, 2012 Repl. Vol.) Criminal Law Article (CR), § 11-208(a)(2), governing the "Possession of visual representation of child under 16 engaged in certain sexual acts," more commonly known as possession of child pornography, which provides in relevant part:

> A person may not knowingly possess and intentionally retain a film, videotape, photograph, or other visual representation showing an actual child under the age of 16 years: … (2) engaged in sexual conduct[.]

The statute has since been amended, as will be discussed further, *infra*, effective October 1, 2019. Unless otherwise noted, our references to CR § 11-208 are to the version in effect at the time of Payne's violations, prior to the 2019 amendments.

[2] Payne was convicted of five separate counts of possession of child pornography. The trial court imposed a sentence of five years, with all but 18 months suspended on Count 1. On counts 2–5, the court imposed consecutive, but fully suspended, five-year sentences for each. The court further ordered a five-year period of probation on Payne's release from incarceration.

## BACKGROUND

Because our review does not implicate the sufficiency of the evidence adduced at trial, we need not recite the facts underlying the charges, other than to provide context for our discussion of the issues presented. *Whitney v. State*, 158 Md. App. 519, 524 (2004) (citing *Craig v. State*, 148 Md. App. 670, 674 n. 1 (2002)). *See also*, *Teixeira v. State*, 213 Md. App. 664, 666 (2013) (quoting *Fitzpatrick v. Robinson*, 723 F.3d 624, 628 (6th Cir. 2013)); *Washington v State,* 190 Md. App. 168, 171 (2010).

## DISCUSSION

### 1. Motion to Suppress

Payne filed a timely motion to suppress a statement he made to police, in his home, on the day of the execution of a search warrant. He challenges the voluntariness of the statement, asserting that he was in custody at the time and that his rights under *Miranda*[3] and its progeny had been violated when he had unequivocally invoked his right to counsel, but the police persisted in questioning him thereafter.

### The Suppression Hearing

The suppression court conducted a hearing on April 5, 2017. In his brief, Payne has included a summary of the testimony developed at the suppression hearing, which, in its brief, the State accepts. We reproduce the summary, with occasional non-substantive editing.[4]

---

[3] *Miranda v. Arizona,* 384 U.S. 436 (1966).

[4] Two witnesses testified at the suppression hearing—Detective Erick Patterson for the State, and Smita Topiwama, called by Payne. Payne did not testify.

2

On July 29, 2016, Detective Erick Patterson, of the Anne Arundel County Police Department, executed a search warrant at Payne's home in Hanover, Anne Arundel County, where Payne lived with his mother. The execution of the warrant was in connection with a child pornography investigation. Patterson was with ten other officers who were members of the child abuse unit, the sex offense unit, and the digital forensic unit. The officers knocked on the door, announced their presence, and identified themselves as county police officers with a search warrant for the residence. Payne answered the door. The officers were dressed in Class C uniforms, consisting of navy-blue cargo work pants and a polo shirt displaying a police badge. They wore tactical or ballistic vests with "Police" on the back of the vests. They were armed with firearms, but there was no testimony that guns were ever drawn. All the officers entered the house at about the same time.

Payne was asked to step outside, where an officer stood with him while other officers went inside to determine the possibility of other occupants. Patterson testified that he did not know if Payne was handcuffed at that time.

After finding no one else in the home, Patterson met Payne in the living room. Payne was not in handcuffs and Patterson did not see Payne restrained in any way. Patterson identified himself to Payne and asked if Payne would speak with him. Patterson testified that he made Payne aware that he was not under arrest. He asked if Payne would accompany him to an upstairs bedroom for an interview. Patterson testified that he would have allowed Payne to leave if he had asked to do so.

3

A female officer, Detective Kristine Mays,[5] was present for the interview which lasted for approximately 45 minutes. According to Patterson, Payne consented to an audio recording of the interview. Neither Patterson nor Mays drew their weapons at any time, nor did Patterson raise his voice or become aggressive during the interview.

Patterson testified that he made no promises or threats, nor did he offer Payne inducements in return for his statement. He did not detect that Payne was under the influence of any substance and he did not have concerns about Payne's mental health. Patterson advised Payne of his Miranda rights. Payne was not arrested that day and charges were not filed until October 3, 2016, more than two months later.

Smita Topiwama, Payne's neighbor, testified that, on the day of the warrant execution, she looked out from her window, and saw five or six police cars, and officers "run into the [sic] Korey's house." Her kitchen window faces Payne's front door. She saw officers taking pictures of the house before they went to the door. Significantly, she testified that she saw an officer place Payne in handcuffs.

### The Ruling

After hearing the testimony and arguments of counsel, the court held the matter *sub curia* and issued a Memorandum Opinion and Order on April 24, 2017, ruling that Payne was not in custody at the time he talked with police. Therefore, the court concluded, the question involving the right to counsel was not implicated.

---

[5] Although transcribed from the suppression hearing phonetically as "Maze," the record and subsequent trial transcripts identify her as Detective "Kristine Mays."

In its Memorandum Opinion, the court indicated a thorough review of the testimony, made findings of fact, to which it applied appropriate case law, both Maryland and federal, and concluded that Payne had not met his burden of proving that he was in custody for purposes of Miranda applicability:

> Before the questioning occurred …, the officers asked the Defendant to go outside while they conducted a search of his home. At that [time], the Defendant had no obligation to stay and could have left the scene. Additionally, Detective Patterson asked the Defendant if he would speak with him, he was not ordered to do so. Once the Defendant agreed, the Defendant led the officers to a bedroom on the third floor, he was not escorted by the Officers or required to comply. Further, only two officers were present in the bedroom at the time of questioning; one was a female detective who sat on the floor, and another was Detective Patterson who sat on a piece of furniture, not blocking or locking the door. Although Detective Patterson read the Defendant his *Miranda* rights, he testified at the suppression hearing that he always gives *Miranda* warnings and he did not believe the Defendant to be in custody or under arrest. Additionally, after listening to the recording of the interview, the conversation was calm, the officers did not ask leading questions, there were no threats, inducements, or any promises made to the Defendant, the conversation only lasted about 45 minutes, and Detective Patterson made it clear that it was up to Defendant if he wished to stop. Further, the Defendant was not arrested at or near the time of the interview. The defendant was not placed under formal arrest until October 4, 2016, about 3 months after the questioning occurred.
>
> When taking all of the factors together, the Defendant did not prove that he was in custody for purposes of *Miranda* applicability. Accordingly, after review of the evidence presented and consideration of the relevant case law, the Court finds that *Miranda* did not apply at the time of the questioning ….

## Standard of Review

We review a circuit court's denial of a motion to suppress on "'only the evidence contained in the record of the suppression hearing.'" *Gupta v. State*, 452 Md. 103, 129 (2017) (quoting *Rush v. State*, 403 Md. 68, 82–83 (2008)). "[W]e 'extend great deference

5

to the findings of the motions court as to first-level findings of fact and as to the credibility of witnesses, unless those findings are clearly erroneous.'" *Jones v. State*, 213 Md. App. 483, 496 (2013) (quoting *Padilla v. State*, 180 Md. App. 210, 218 (2008)). In our consideration, "we 'review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party,' in this case, the State." *Id.* (quoting *Bost v. State*, 406 Md. 341, 349 (2008)). However, we review the suppression court's legal conclusions *de novo* by undertaking our own "independent constitutional appraisal of the record by reviewing the law and applying it to the facts …." found by the suppression court. *Gupta*, 452 Md. at 129 (internal quotations and citation omitted). Moreover, a defendant must show that he was in custody and subject to interrogation as a condition of entitlement to the protection of *Miranda*. *Smith v. State*, 186 Md. App. 498, 519–20 (2009). *Accord Moody v. State*, 209 Md. App. 366, 380 (2013) (the burden of showing custody and interrogation lies with the movant).

The issue before us is whether Payne established to the suppression court that he was in custody at the time of the statement given to police. Payne argues:

> Considering the totality of the circumstances in this case, particularly the entry of eleven officers armed and in uniform, the searching of the premises, the request to remove to an upstairs bedroom for an interview with two detectives and the failure any officer to tell Mr. Payne that he was free to leave, the circuit court erred in determining that the interrogation was not a custodial one. Because Mr. Payne was "in custody" and was questioned, he had the right to be free from compelled self-incrimination.

(Footnote omitted).

In support of his argument, Payne refers us to *Thompson v. Keohane*, 516 U.S. 99 (1995), wherein the Supreme Court reiterated that a determination of "in custody" involves two "discrete inquiries":

> [F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a formal arrest or restraint [of] freedom of movement of the degree associated with a formal arrest."

516 U.S. at 112 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

In that respect, courts have determined factors to be considered in determining custody including:

> "[W]hen and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning whether he came completely on his own, in response to a police request or escorted by police officers. Finally, what happened after the interrogation whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning."

*Owens v. State*, 399 Md. 388, 429 (2007) (quoting *Whitfield v. State*, 287 Md. 124, 141 (1980)).

The uncontroverted testimony of Detective Patterson, relied on by the suppression court, was that Payne was not restrained, that he was cooperative, that no weapons were shown or drawn, that he responded to Patterson's request for an interview, that he was not

7

coerced or forced to speak, that no promises or inducements were made, that he was advised that he was not under arrest, that he would have been permitted to leave the interview had he so requested, that the interview lasted about 45 minutes, after which, and after the search ended, the police left Payne in his home. He was not formally arrested until after the charges were filed in October 2016.

We do not overlook the testimony of Ms. Topiwama, who testified that she observed Payne, while outside his home, in handcuffs. The suppression court found her not to be credible because of inconsistencies in her account of the event, *vis-à-vis* the testimony of Patterson.[6] We do not disturb the hearing court's credibility assessments unless clearly erroneous.

It was Payne's burden to prove custody. *Smith*, 186 Md. App. at 519–20. Payne opted to remain silent at the suppression hearing; therefore, we have been provided no contrast to the evidence given by Detective Patterson, upon which the court reasonably relied.

We agree with the reasoning of the suppression court that Payne, at the time of the interview with, and statement to, Detectives Patterson and Mays, was not in custody. Because the circumstances were non-custodial, we need not reach his contention that he was denied the right to counsel.[7]

---

[6] The testimony of Ms. Topiwama, for whom English is apparently a second language, was not the pillar of clarity and contained variations as to what and when she saw of the police interaction with Payne.

[7] At the suppression hearing, Payne asserted that Patterson's advice of rights, given at their initial contact, is a concession that he was in custody at that point. However, the giving of

We shall not disturb the suppression court's rulings.

## 2. Other Bad Acts Evidence

The search conducted by police at Payne's home resulted in the seizure of several data storage devices, which the State characterized in its brief as "USB thumbdrives and ScanDisc cards."[8] Collectively, those devices contained more than 3,000 images, of which 527 were identified by the State's witnesses as either child pornography or child erotica. Of those images so identified, the State's Attorney selected five as the basis of the possession charges. Those five images were found on the same data stick but depicted five different children. Over objection, the State's witness, Detective Joshua Williams, described images stored on other storage devices. Williams was asked:

> [THE STATE]: You indicated that there were other things on the data stick other than child pornography. What, if any, data did you observe on that thumb drive?
>
> [WITNESS]: Again, it had similar images that had pictures of the defendant taking selfies. It had some captures of the defendant in these video chats. It had some pictures of teen girls. This one also had a video that depicted the

*Miranda*-type advice in a non-custodial setting does not render the setting custodial as a matter of law. *See Chase v. State*, 224 Md. App. 631, 646 (2015) (explaining, "'courts have made clear that a cautious or gratuitous recitation of *Miranda* warnings is irrelevant to whether there has been an arrest, or even a custodial interrogation'" (quoting *Cotton v. State*, 386 Md. 249, 266 (2005))). *Accord Cummings v. State*, 27 Md. App. 361, 376 (1975) (determining that "the gratuitous and unnecessary giving of Miranda warnings will [not] operate to convert an otherwise noncustodial situation into a custodial one").

[8] The terms "data stick" and "thumb drive" are also used interchangeably by both parties in reference to the electronic data storage devices seized from in Payne's home pursuant to the search warrant. Merriam-Webster defines a "thumb drive" as "a small usually rectangular device used for storing and transferring computer data." *Thumb Drive*, Merriam-Webster, https://www.merriam-webster.com/dictionary/thumb%20drive (last visited Oct. 28, 2019).

9

defendant setting up a recording device and masturbating next to a sleeping woman.[9]

It is that response that forms the basis of Payne's claim that the trial court erred in permitting that "other bad acts" evidence, contrary to Rule 5-404.[10]  His trial counsel argued that the Williams' testimony about the existence of a video of Payne masturbating next to a sleeping woman was not relevant to the charges of possession of child pornography and while characterized as admittedly "unsavory" and "repulsive" it was unnecessary to prove the State's case and, therefore, prejudicial.

The State responded to defense counsel's prejudice arguments by asserting that the evidence was admissible under the identity exception in Rule 5-404(b) because Payne's defense, in part, was that the pornographic images were the property of his mother's companion and were not in his possession.[11]

---

[9] Defense counsel responded by saying "Your Honor, may we approach?"  Although counsel did not request any specific relief, it is clear from the extensive colloquy, including counsel's argument, that a timely objection was lodged.

[10] Maryland Rule 5-404, governing "Character evidence not admissible to prove conduct; exceptions; other crimes," provides, in relevant part:

> (b) Other crimes, wrongs, or acts.  Evidence of other crimes, wrongs, or acts including delinquent acts as defined by Code, Courts Article, § 3-8A-01 is not admissible to prove the character of a person in order to show action in conformity therewith.  Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

[11] The State also argued that Payne's statement to investigators that he made reports to the Center for Missing and Exploited Children of images inadvertently viewed was impeached by the evidence in the masturbation video.  The State does not pursue that contention on appeal.

Payne is correct that Rule 5-404 is a rule of relevance, requiring a finding of special relevance to the crime(s) charged in order to admit otherwise inadmissible evidence of other bad acts. *See generally Streater v. State*, 352 Md. 800 (1999). *See also* Rules 5-401 through 5-413 (governing "Relevancy and its Limits" for the admissibility of evidence). Thus, "[e]xcept as otherwise provided by constitutions, statutes, or [the Maryland Rules], or by decisional law not inconsistent with these rules, all relevant evidence is admissible." Rule 5-402.

We have said "'a bad act is an activity or conduct, not necessarily criminal, that tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying lawsuit.'" *Brice v. State*, 225 Md. App. 666, 692 (2015) (quoting *Klauenberg v. State*, 355 Md. 528, 549 (1999)). Because of the significant risks associated with the admission of such evidence, it is admissible only when the bad acts evidence "has 'special relevance—that it is substantially relevant to some contested issue.'" *Smith v. State*, 218 Md. App. 689, 710 (2014) (quoting *Wynn v. State*, 351 Md. 307, 316 (1998)). *Accord Wilder v. State*, 191 Md. App. 319, 343 (2010) (explaining that "[t]his Rule and 'the common law preclude the admission of other crimes [or other acts] evidence, unless the evidence fits within a narrowly circumscribed exception.'" (quoting *Carter v. State*, 366 Md. 574, 583 (2001))). Rule 5-404(b) provides the "special relevancy" exceptions to the limited admissibility of bad acts evidence, allowing admission of such evidence for the purpose of proving "motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident." *See Smith*, 218 Md. App. at 710 (citations omitted).

We review a trial court's ruling on the admissibility of other crimes/bad acts evidence by following the "*Faulkner* standard," a three-step process:

> *First*, the court determines whether the evidence falls into one of the recognized exceptions[]…. This is not a matter of discretion, and we review that categorization *de novo*. *Second*, if the evidence falls into a category of exceptions, the court decides by clear and convincing evidence whether the defendant was involved in the prior … bad act, and we review that finding for sufficiency of the evidence. *Third*, the court balances the probative value of the evidence against the danger of unfair prejudice, a determination we review for abuse of discretion.

*Bellard v. State*, 229 Md. App. 312, 342–43 (2016) (emphasis in *Bellard*) (citing *State v. Faulkner*, 314 Md. 630, 634–35 (1989)).

Under the first prong, the State's justification for the admissibility of the testimony concerning the masturbation video is the "identity" exception to the rule. The State argues that the video having been found in close proximity to the proscribed images, in Payne's home, serves to establish his ownership or control of the images for which he was charged, indeed of all of the storage devices that were recovered together in the same white box. In support of its position, the State points to defense counsel's comments in his opening statement:

> [DEFENSE COUNSEL]: … you're going to hear they found child porn in that house without a doubt. But it didn't belong to Mr. Korey Payne. And the government won't prove that it did because it belonged to somebody else.
>
> You heard the government tell you who lived in that home. It was Korey Payne, his mother, Gloria Payne, and her fiancé, Antonio Kohl. You're going to hear evidence that, in fact, it was not Korey Payne's pornography. It was somebody else's. It was his mother's fiancé's.

Those comments, the State argues, placed "the issue of identity as to the possessor of the child pornography contained on the storage devices found in the white box …

12

squarely before the jury[,]" and that "'the test of relevance is whether, in conjunction with all other relevant evidence, the evidence tends to make the proposition asserted more or less probable.'"  (Quoting *Donati v. State*, 215 Md. App. 686, 736 (2014)).

While denying its relevance, Payne concedes that the masturbation video constitutes an "act" as contemplated by the rule, thereby satisfying the second prong of the *Faulkner* standard.

Lastly, even if "bad acts" evidence has a special relevance to an issue, it may be excluded if its probative value is "'substantially outweighed by the danger of unfair prejudice[.]'" *Gutierrez v. State*, 423 Md. 476, 497–98 (2011) (quoting Rule 5-403).  And, "[p]rejudice that would 'outweigh probative value involves more than [mere] damage to the opponent's cause.'" *Id*. at 486 (quoting *State v. Allewalt*, 308 Md. 89, 102 (1986)).

After hearing defense counsel's full argument at the time of the introduction of the evidence, the trial court overruled the implicit objection.  In its consideration of the potential prejudice, the court permitted Williams' description of the video, but prohibited the State from displaying the video.  We are satisfied that the court engaged in a sufficient balancing of the probative value of the evidence against the danger of unfair prejudice.  We find neither error nor abuse of discretion in the court's rulings.

### 3.  Merger of Sentences — Unit of Prosecution

Finally, Payne argues that the trial court erred in sentencing separately on each of the five convicted counts.  Payne asserts, conversely, that he was subject to but one sentence because all the images were held by him at the same time and place, thus

13

constituting but one offense. Alternatively, he suggests that we apply the rule of lenity. We have found no Maryland case that has addressed the question presented by Payne.

Payne was sentenced separately and consecutively for each of the five convicted counts of possession of child pornography. On appeal, he argues that a conviction for possession of multiple images, found on the same device at the same time and place should be considered as a single act and, therefore, "[f]our of the convictions and sentences in this case must be vacated …." He contends that, on these facts, there was but one unit of prosecution warranting but one sentence. He submits, as well, that, "at a minimum," this case is ripe for application of the rule of lenity.[12]

At sentencing, the State offered a sentencing memorandum urging the court to impose separate sentences for each convicted count because "possession of each photo, all depicting a different pre-pubescent girl, constitutes a separate criminal act. [Payne's] crimes for possession of child pornography are not based on a single criminal act since each count stems from the possession of a separate and different pornographic image of a child[.]" (Footnote omitted).

---

[12] Recently, in *State v. Bey*, 452 Md. 255, 275 (2017), the Court of Appeals said "[t]he rule of lenity instructs that courts 'will not interpret a … criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the legislature] intended.' 'Stated simply, the rule of lenity only informs our interpretation of a criminal statute when the standard tools of statutory interpretation fail to discern the intent of the Legislature.'" (Internal citations omitted). Because, in this case, we conclude that "the standard tools of statutory interpretation" have led us to understand the intent of the Legislature, we find no need for consideration of the rule of lenity.

The parties acknowledge that the courts of our sister states, and the federal judiciary, have not reached unanimity on the question of sentencing following conviction of more than one count of possession of child pornography or the proper unit of prosecution under the applicable statute.

When interpreting a statute and its statutory scheme, "[w]e assume that the legislature's intent is expressed in the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly." *Phillips v. State*, 451 Md. 180, 196 (2017). Therefore, we begin with the plain language of CR § 11-208, the statute under which Payne was charged and convicted. *See Mihailovich v. Dep't of Health & Mental Hygiene*, 234 Md. App. 217, 224 (2017), *cert. denied*, 457 Md. 396 (2018) ("When this Court is 'called upon to construe a particular statute, we begin our analysis with the statutory language itself since the words of the statute, construed according to their ordinary and natural import, are the primary source and most persuasive evidence of legislative intent.'" (quoting *Duffy v. CBS Corp.*, 232 Md. App. 602, 613 (2017), *rev'd on other grounds*, 458 Md. 206, *reconsideration denied* (May 17, 2018))).

As we have explained, "[a]ll '[l]egislation is created with a particular objective or purpose.'" *Mihailovich*, 234 Md. App. at 224 (quoting *Bowers v. State*, 227 Md. App. 310, 322 (2016)). As such, it is

> "[o]ur cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. We first look to the language of the statute to determine its plain meaning, and we neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute."

15

*Connor v. State*, 223 Md. App. 1, 15 (2015) (quoting *McCloud v. Dep't of State Police*,

*Handgun Permit Rev. Bd.*, 426 Md. 473, 479–80 (2012)).

> However, "[w]here the statute's language is ambiguous or not clearly consistent with the statute's apparent purpose, the court search[es] for [the General Assembly's] intent in other indicia, including the history of the [statute] or other relevant sources intrinsic and extrinsic to the legislative process[,] in light of: (1) the structure of the statute; (2) how [the statute] relates to other laws; (3) the statute's general purpose; and (4) [the] relative rationality and legal effect of various competing constructions."

*Mihailovich*, 234 Md. App. at 224 (quoting *Hailes v. State*, 442 Md. 488, 495–96 (2015)).

Pertinent to our discussion, CR § 11-208(a)(2) provides that: "A person may not knowingly possess and intentionally retain a film, videotape, photograph, or other visual representation showing an actual child under the age of 16 years: … (2) engaged in sexual conduct[.]" But, the statute does not define the unit of prosecution.

The statute, on its face, is clear and unambiguous as to the proscribed conduct, expressly providing that the possession of "***a*** … visual representation" is prohibited. (CR § 11-208(a) (emphasis added). Payne posits that the use of the word "a" in the statute is not conclusive as to its meaning, and thus, we "cannot end [our] inquiry and 'apply the plain meaning of the statute.'" (Citation omitted).

Payne relies on the Revisor's Note for CR § 11-208, contending that "[w]hile the version of the statute applicable to [his] prosecution uses the phase '***a*** film, videotape, photograph…,' the [Note] states that the recodification 'is new language derived without substantive change from former Art. 27, § 419B.'" (Emphasis in brief) (quoting Revisor's Note for CR § 11-208 (2002)). Because of that, he insists that "it cannot be said that the

16

Legislature, in using 'a' instead of 'any,' meant to express its intention that the unit of prosecution for possession of child pornography is each individual image possessed at one time and one place." Payne suggests that, with that interpretation, the statute is ambiguous, and the Legislative intent "could just as likely have been to make clear that even one image will suffice to bring a prosecution."

## Statutory Construction

Section 11-208 of the Criminal Law Article is found in Title 11, governing Indecency and Obscenity, under Subtitle 2—Obscene Matter. Subtitle 2 also includes statutes that proscribe the distribution, display, and advertising of obscene matter, and statutes relating to child pornography. *See* CR §§ 11-201 through 11-211. We first look to the language of the related child pornography statutes. In doing so, we are mindful that

> [t]he articles "a" or "an" are indefinite articles, in contrast to the definite article "the." They do not, however, necessarily imply the singular, but generally take their meaning in that regard from the context in which they are used. Most courts have construed "a" or "an" as meaning "any" and as not restricted to just one.

*Evans v. State*, 396 Md. 256, 341 (2006). Thus, we consider both the language and context in order to discern the Legislature's intended meaning.

Section 11-207, which immediately precedes CR § 11-208 in Subtitle 2, is the overarching statute that proscribes the production, solicitation, promotion, and distribution of child pornography. The statute provides, in relevant part, that:

(a) *A person* may not:

(1) cause, induce, solicit, or knowingly allow *a minor* to engage as *a subject* in the production of *obscene matter* or *a visual representation*

17

or performance that depicts *a minor* engaged as *a subject* in sadomasochistic abuse or sexual conduct;

(2) photograph or film *a minor* engaging in *an obscene act*, sadomasochistic abuse, or sexual conduct;

(3) use *a computer* to depict or describe *a minor* engaging in *an obscene act*, sadomasochistic abuse, or sexual conduct;

(4) knowingly promote, advertise, solicit, distribute, or possess with the intent to distribute *any matter*, visual representation, or performance:

> (i) that depicts *a minor* engaged as *a subject* in sadomasochistic abuse or sexual conduct; or
>
> (ii) in a manner that reflects the belief, or that is intended to cause another to believe, that *the matter*, visual representation, or performance depicts *a minor* engaged as *a subject* of sadomasochistic abuse or sexual conduct[.]

CR § 11-207(a)(1)–(4) (emphasis added).

We glean from the language of these subsections that the drafters were focused on the individual victim in the singular, *e.g.,* "a minor" engaged as "a subject." The use of "a" throughout this statute qualified each reference in the singular. Similarly, when considering subsection (4) of the statute, it is equally apparent that the use of the term "any" was a qualifier for what kinds of matter were proscribed, intending it to be all inclusive of the listed items, statutorily defined as "matter."[13] In this instance, the term "matter" is not

---

[13] Section 11-201 of the Criminal Law Article defines the term "matter" as meaning: "(1) a book, magazine, newspaper, or other printed or written material; (2) a picture, drawing, photograph, motion picture, or other pictorial representation; (3) a statue or other figure; (4) a recording, transcription, or mechanical, chemical, or electrical reproduction; or (5) any other article, equipment, machine, or material." CR § 11-201(d)(1)–(5).

18

used in reference to a single identifiable item, rather, it is used to identify a category of items.

Comparing the language of CR § 11-207 with that of CR § 11-208, we are persuaded that this interpretation is consistent with what the Legislature intended. Section 11-208(a), provides: "*A person* may not knowingly possess and intentionally retain *a* film, videotape, photograph, or other visual representation showing *an actual child* under the age of 16 years[.]" (Emphasis added). While, as noted, the use of "a" can be interpreted to be all-inclusive, as can be the use of "any," it is clear within the context of this statute, that the use of "a" and "an" qualify the intended unit of prosecution in the singular. Specifically, where the intended unit of prosecution consists of a single visual representation that must contain "an actual child." Consistent with the language of CR § 11-207, the actual child victim is the focus of the possession statute.

In distinguishing the language of the two statutes, we note that CR § 11-207(a)(4) contains the use of the term "any" in proscribing the "promot[ion], advertise[ment], solicit[ation], distribut[ion], or possess[ion] with the intent to distribute *any* matter, visual representation, or performance." (Emphasis added). While CR § 11-208 contained the term "any" when originally enacted as Art. 27 § 419B (1992), when it was repealed and re-codified under what is now CR § 11-208 the drafters substituted "a" for the use of "any" when identifying that which was prohibited. Despite the change in language of CR § 11-208, "any" was retained in CR § 11-207.

Significant is the distinction in how those two statutes characterize the types of items to be prohibited. Section 11-207(a)(4), refers to "any matter, visual representation, or

19

performance[,]" while relying on the definition of "matter," as provided in the Subtitle's general definitions in CR § 11-201(d), to illustrate what items are prohibited. Section 11-208(a), however, seemingly provides a narrower classification of prohibited items, including "a film, videotape, photograph, or other visual representation …." In fact, the latter imposes even further restrictions on the prohibited items by requiring that an "actual child under the age of 16 years[]" be shown. In contrast, CR § 11-207(a)(4)(ii) merely requires that the proscribed image depict a minor, under the age of 18, in such a manner to cause someone to believe that the image depicts the minor engaged in the proscribed conduct.[14]

Section 11-208.1 provides, *inter alia*, the duties and responsibilities imposed on internet service providers in relation to the reporting and removal of child pornography. This statute includes its own definition of "child pornography" as meaning "*any* electronic image or visual depiction that is unlawful under § 11-207 or § 11-208 of this subtitle." CR § 11-208.1(a)(2) (emphasis added). Thereafter, and throughout the statute, child pornography is quantified as "an item" or "the item." *See generally* CR § 11-208.1.

The statute first refers to the authority of a law enforcement officer to request an internet service provider to remove child pornography when that officer "receives information that *an item* of alleged child pornography resides on a server or other storage device" belonging to an internet service provider. CR § 11-208.1(b)(1)–(3) (emphasis added). If the provider refuses the officer's request for voluntary removal of "the item,"

---

[14] We use the terms "visual representation" and "image" interchangeably throughout without distinction to meaning.

20

the statute affords the officer the ability to apply for and obtain a court order directing removal.  CR § 11-208.1(c)–(d).

The statute also requires internet service providers to "report the location of an item of child pornography" in "a server or other storage device" belonging to the provider and within the State, or if the item "pertains to a subscriber or user of the interactive computer service who resides in the State."  CR § 11-208.1(h)(1)(i)(1)–(2).

Similarly, the relevant statutes governing obscene matter, as referenced under Subtitle 2, apply similar language, which supports our interpretation of the legislative intent for the use of "a" and "an" as quantifying a single unit of prosecution for possession of each individual image showing a different child victim in each.  *See* CR § 11-202 (prohibiting the importation, distribution, preparation, and possession of "*any* obscene matter," and relying on § 11-201(d) for the definition of "matter" (emphasis added)); CR § 11-203 (prohibiting the display and sale of an obscene item to a minor, while providing its own definition of "item" and quantifying it with the use of "*an* item" (emphasis added)); CR § 11-205 (prohibiting the advertising and promotion, generally and without quantifiers, "of matter the person represents or holds out to be obscene[,]" while relying on § 11-201(d) for the definition of "matter").

**Legislative History**

Maryland's first child pornography statute, codified as Article 27, § 419A of the former Article 27 (Crimes and Punishments), now codified under CR § 11-207, was enacted in 1978 following the enactment of the federal Protection of Children Against Sexual Exploitation Act of 1977.

21

In *Moore v. State*, 388 Md. 446 (2005), the Court of Appeals discussed the history

of both the federal and Maryland child pornography statutes, explaining:

> The statutory language and the legislative history of the initial Maryland
> child pornography statute suggest that the Legislature was targeting the child
> pornography industry, *i.e.*, the creators and distributors of the material. The
> statute made it a felony to solicit, cause, induce, or knowingly permit a person
> under sixteen to engage as a subject in the production of obscene matter, or
> to photograph or film a person under sixteen engaged in an obscene act. *See*
> 1978 Md. Laws, Chap. 573. The bill file contains a letter from an Assistant
> Attorney General describing the bill as "legislation which is designed to
> prohibit the production and distribution of [child pornography] within the
> boundaries of this State … complement[ing] the federal bill." Additionally,
> a member of the National Conference of State Legislatures testified before a
> subcommittee of the House Judiciary Committee detailing the steps being
> taken by states across the country to criminalize and "to prosecute those
> responsible for using children in obscene materials and selling them for
> profit."

*Moore*, 388 Md. at 461.

It would be another 14 years before the General Assembly took aim at mere

possession of child pornography with the 1992 enactment of § 419B of the former Art. 27.

While the original child pornography statute targeted the suppliers of such material, the

1992 enactment of the possession statute targeted the end of the market—consumers of

child pornography.

> At that time of its enactment, the statute provided:
>
> A person may not knowingly possess *any* film, videotape, photograph,
> or other visual representation depicting an individual under the age of 16
> years engaged as a subject of sadomasochistic abuse or in sexual conduct, or
> in a state of sexual excitement, as those terms are defined under § 416A of
> this Article.

Art. 27, § 419B(a) (1992) (emphasis added).  Violations were defined as misdemeanors,

and as punishment, the statute provided, for a first offense, "a fine not exceeding $2,500 or

22

imprisonment not exceeding 1 year or both[,]" and for a second or subsequent offense "a fine not exceeding $5,000 or imprisonment not exceeding 2 years or both." Art. 27, § 419B(c)(1)–(2) (1992).

Senate Bill (SB) 38 and House Bill (HB) 544, were cross-filed and resulted in the enactment of § 419B in Chapter 443 of the 1992 Session laws. The Bill files relating to those bills contain letters of support and endorsements from various agencies, including Governor William Donald Schaefer's Council on Child Abuse and Neglect. There can be no doubt that enactment of SB 38 and HB 544 expressed a strong public policy.

In 2002, Article 27 was repealed and reenacted as the Criminal Law Article (CR). *See* 2002 Md. Laws, ch. 26. The statute replacing Art. 27, § 419B is now CR § 11-208 and provided, in relevant part: "A person may not knowingly possess *a* film, videotape, photograph, or other visual representation depicting an individual under the age of 16 years: … engaged in sexual conduct[.]" CR § 11-208(a)(2) (emphasis added). As we have discussed, the change in language from "any" in the original version of the statute to "a" in the re-codified revised version of the statute is not insignificant. While there is no substantive change, as the Revisor's Note states, the change in language signifies a clarification as to the intended unit of prosecution. The revisions made in the penalties provision, referring to "violation" rather than "offense" offer additional support for this interpretation of the language change. CR § 11-208(b) (2002).

23

The change in language in the penalties provisions provides clarification for the original and otherwise ambiguous term "offense."[15] Transitioning from the term "offense" to "violation"[16] imports an intent that each violation of the statute is intended to be a separate crime. This interpretation is also supported by the change in language of subsection (b)(2) from "a second or subsequent offense" to "each subsequent violation," suggesting that each separate violation is punishable. The Revisor's Note to CR § 11-208 explained that "the references to a 'violation' are substituted for the former references to an 'offense' for consistency within this Article[,]" and directed attention to the General Revisor's Note to the Criminal Law Article for further explanation.

---

[15] Black's Law Dictionary defines "offense" as "1. A violation of the law; a crime, often a minor one. — Also termed criminal offense." *Offense*, Black's Law Dictionary (11th ed. 2019). It then provided an additional explanation to the versatility of the term's meaning:

> "The terms 'crime,' 'offense,' and 'criminal offense' are all said to be synonymous, and ordinarily used interchangeably. 'Offense' may comprehend every crime and misdemeanor, or may be used in a specific sense as synonymous with 'felony' or with 'misdemeanor,' as the case may be, or as signifying a crime of lesser grade, or an act not indictable, but punishable summarily or by the forfeiture of a penalty."

*Id.* (quoting 22 C.J.S. Criminal Law § 3, at 4 (1989)). *See also Twigg v. State*, 447 Md. 1, 26–27 (2016) (reflecting its versatile meaning by concluding that the term "offense," in the context of Courts and Judicial Proceedings Article, § 12-702(b), "means not simply one count in a multi-count charging document, but rather the entirety of the sentencing package that takes into account each of the individual crimes of which the defendant was found guilty").

[16] The term "violation" is defined as "1. An infraction or breach of the law; a transgression. See infraction. 2. The act of breaking or dishonoring the law; the contravention of a right or duty." *Violation*, Black's Law Dictionary (11th ed. 2019).

The General Revisor's Note to the 2002 Criminal Law Article further explained the language modification, clarifying that:

> The former law used the terms "crime" and "offense" interchangeably to mean a felony or misdemeanor under the laws of the State, with no consistent rationale for choosing one or the other. In order to provide uniform language in this revision and for consistency with the Criminal Procedure Article, the Criminal Law Article Review Committee chose to use the term "crime" to mean *a particular act prohibited* as a felony or misdemeanor, and the term "violation" to refer to *a particular instance of a crime…*.

(Emphasis added).

The explanation of the General Revisor's Note directly addresses the intended meaning of the term "violation," explaining that it was used in the Article to "refer to a particular instance of a crime." *Id.* Applying that explanation to the specific subsections of the 2002 version of CR § 11-208(c), intends the crime to be the possession and retention of a prohibited image depicting a child under 16, and the certain punishments being for the first "particular instance of [the possession] crime" and for each subsequent "particular instance of [the possession] crime." The "particular instance" for each of Payne's five charges pertain to his possession and retention of five photographs, each depicting a different child.

Similarly, subsequent amendments to the statute provide additional insight into the legislative intent that the intended unit of prosecution being each photograph or image depicting a different child victim. Of significance, the 2007 amendments substituted the phrase "showing an *actual child*" for the phrase "depicting an individual." *See* CR § 11-208(a) (2007) (emphasis added). *See also* 2007 Md. Laws, ch. 596.

25

Among the stated purposes of the enacted revisions was the goal to "make the offense of knowingly possessing a … visual representation showing an individual under a certain age apply only to an actual child under a certain age[.]" *See* 2007 Md. Laws, ch. 596. The use of the words "actual child," rather than a mere depiction of one, denotes the importance of a singular child victim.

The revised statute also added the words "and intentionally retain," appearing to differentiate between a brief and accidental encounter of such material and an intent to retain and maintain possession of the material. CR § 11-208(a) (2007). Consistent with that interpretation of the amendment, the statute also offered, for the first time, an affirmative defense for a violation, providing in relevant part: "It is an affirmative defense to a charge of violating this section that the person promptly and in good faith: … took reasonable steps to destroy *each* visual representation[.]" CR § 11-208(d)(1) (2007).[17] Taken together, we believe these amendments illustrate the Legislature's intended unit of prosecution to be a separate charge for each photograph or image of each individual child victim shown.

In 2009, the Legislature enacted additional amendments to the statute, taking a more aggressive stance on the crime of possession by, for the first time, designating a subsequent offense a felony and by substantially increasing the penalty for subsequent offenders. *See* 2009 Md. Laws, chs. 510 and 511. CR § 11-208(b) (2009).

---

[17] The revisions also enhanced the penalties upon conviction, from "1 year" to "2 years", for the first violation, and from "2 years" to "5 years" with an increase in a fine up to $10,000, for each violation thereafter. CR § 11-208(b) (2007).

26

The 2009 amendments emanated from Senate Bill 99 and House Bill 9, which were cross-filed and passed as Chapters 510 and 511, respectively. As in the earlier consideration of the subject, the Bill file for House Bill 9 contained, *inter alia*, written testimony in support of the proposed amendments by child advocacy groups, law enforcement agencies, and citizens explaining to legislators the severe impact child pornography has on children.

The current language of the statute, reflecting the most recent amendments, also provides insight. The statute now proscribes that "[a] person may not knowingly possess and intentionally retain a film, videotape, photograph, or other visual representation showing an actual child or a computer-generated image that is indistinguishable from an actual and identifiable child under the age of 16 years[]…." CR § 11-208(b) (2019). The statute also includes a definition for the phrase "indistinguishable from an actual and identifiable child," as meaning that "an ordinary person would conclude that the image is of an actual and identifiable minor[,]" which "includes an actual minor or a computer-generated image that has been created, adapted, or modified to appear as an actual and identifiable child." CR § 11-208(a)(1)–(2) (2019). These revisions were the result of he Legislature's passing of the cross-filed House Bill 1027 and Senate Bill 736 as Chapters 325 and 326, respectively. 2019 Md. Laws, chs. 325, 326. The stated purpose of the amendments was for "prohibiting a person from knowingly possessing and intentionally retaining a certain representation showing a computer-generated image that is indistinguishable from an actual and identifiable child under a certain age portrayed in a certain manner[.]" 2019 Md. Laws, chs. 325, 326.

27

Additionally, the Fiscal and Policy Note included with the Senate Bill 736 Bill file provided the background for the proposed revisions, noting the number of violations of CR § 11-208 in the 2018 fiscal year were 645 in the District Court and 504 in the circuit court. It explained, in relevant part, that: "A violation is a charge filed with the court. It is not a conviction, and one person *may be associated with multiple violations*." (Emphasis added). This explanation is consistent with that from the 2002 General Revisor's Note to the Criminal Law Article, characterizing a "violation" as a "particular instance of a crime." Importantly, the Fiscal and Policy Note also noted that 60 individuals were sentenced in the circuit courts on 119 counts. Inferably, the Legislature's awareness of individuals being charged with multiple counts for violations of CR § 11-208 and circuit courts sentencing individuals on multiple counts of those violations, and its inaction to restrict courts from doing so, supports the intended unit of prosecution being each photograph showing a different child victim.

Addressing his interpretation of the legislative intent as to the unit of prosecution, Payne refers to an excerpt from the written testimony of Chris Trionfo, the State Director of the American Family Association of Maryland, in the 1992 Bill file for House Bill 544. Payne places significance on Trionfo's reference to a 1986 statement by the U.S. Congress Permanent Sub-Committee on investigations on Child Pornography and Pedophilia: "'[I]t is not unusual for pedophiles to possess collections containing several thousand photographs, slides, films, video tapes and magazines depicting nude children and children engaged in a variety of sexual activities.'" Payne avers, with that in mind, that "[i]t would be unreasonable to charge such a person with 'several thousand' counts of possession of

28

child pornography where each count carries a maximum penalty of five years in prison, where all of the images were possessed at the same time and place." While we appreciate Payne's reliance on such testimony, we find it to be of relatively low value in the context of the statute's legislative history because it does not reflect the Legislature's intent; rather, it merely offers Trionfo's commentary on why he supports the Bill. For that reason, we are disinclined to rely on Trionfo's or, for that matter, the testimony of any others as not reflecting legislative intent.[18]

Furthermore, were we to accept Payne's interpretation of the statute, encompassing a single offense no matter the number of images found, there would be less of a deterrence to those who would acquire and possess significant quantities of child pornography. The effect of statutes enacted, as an overarching public policy, to impose deterrence would simply be *de minimus* if the punishment were to be the same for a single charge based on a single image as for a single charge based on "several thousand" images. The goal of the statute—to protect child victims from sexual exploitation—would be significantly minimized.

### Maryland Case Law

While Maryland courts have not directly addressed the intended unit of prosecution for the crime of possession of child pornography, both Payne and the State have called our

---

[18] *See* Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 446, 463 (1995) (discussing judicial reliance on voices from outside the legislative process and noting that courts "should avoid citing testimony or letters from individuals outside the General Assembly as evidence of legislative purpose ….").

attention to several Maryland cases for support of their respective positions.

Payne draws a parallel from *Randall Book Corp. v. State*, 316 Md. 315 (1989). Randall was the owner of a book store that had been the subject of a search warrant, resulting in 252 charges from 126 different magazines that had been seized. 316 Md. at 318. All of the charges pertained to the advertisement of sexual displays in violation of Article 27, § 416D(a),[19] and not to child pornography or the possession thereof. The State elected to proceed on 126 charges for each magazine based on those violations of Art. 27, § 416D(a), which proscribed "'knowingly display[ing] for advertising purposes any picture, photograph, drawing, sculpture or other visual representation or image of a person or portion of the human body that depicts sadomasochistic abuse, sexual conduct or sexual excitement, or any verbal description or narrative account of these activities or items.'" *Id.* at 319 (quoting Art. 27, § 416D(a) (1982)). Randall was convicted of 116 of the charges, and the trial court imposed a $500 fine for each conviction. *Id.*

Failing on direct appeal, Randall proceeded to challenge the fines as illegal multiple sentences imposed for the same offense, in violation of the Double Jeopardy Clause and the Eighth Amendment prohibition against cruel and unusual punishment. 316 Md. at 319. Randall's motion to correct illegal sentence was denied and the Court of Appeals issued a writ of *certiorari* before this Court's consideration of his appeal. *Id.*

The *Randall* Court explained: "The multiple sentence-single statute problems, with which we are concerned here, embrace a wide range of factual situations and statutory

_____

[19] Art. 27, § 416D is now codified as CR § 11-105.

provisions. The key, of course, is legislative intent." *Id*. at 324. The Court undertook an

analysis of the legislative intent for the unit of prosecution under § 416D(a). *Id*. at 323–

29. It explained the appropriate process for discerning legislative intent:

> In attempting to determine what the legislature intended to be the unit of prosecution in this statute, we may look to the penalty provided for each offense. If the maximum penalty permitted is quite substantial, that fact may militate against an intent to create multiple units of prosecution. *See Prince v. United States*, [352 U.S. 322, 327] (1957). Moreover, in addition to considering the specific words of the statute, we may consider the general history and prevailing mood of the legislative body with respect to the type of criminal conduct involved….

*Randall*, 316 Md. at 326–27.

The Court also clarified that it is only when "the legislative intent cannot be

determined, and the indicia point with equal force in opposite directions, [that] the rule of

lenity dictates that the matter be resolved in favor of the accused and against the possibility

of multiple punishments." *Id*. at 327 (citing *Albernaz v. United States*, 450 U.S. 333, 342–

43 (1981)).

In its review of the language of the obscenity statute, the Court rationalized its

conflicting interpretation of the statute:

> It seems apparent that the legislature specifically intended to establish a small unit of prosecution. Indeed, a literal reading of the statute might subject a defendant to separate punishment for each obscene picture or narrative account found in a magazine. That interpretation, while it might comport with the literal language used, would not afford the statute a "commonsensical meaning," and could create constitutional problems similar to those surrounding the hypothetical tailor who is charged with each stitch taken on the Sabbath. We think it much more likely that the legislature intended the unit of prosecution to be each separate magazine, film, book, or other similar item.

*Randall*, 316 Md. at 327–28 (footnote omitted). Similarly, the Court concluded that,

31

[in] [c]onsidering the particular words of the Maryland statute, and also considering the attitude and apparent purpose of the legislature with respect to the display and sale of obscene materials, we conclude that the legislature intended the knowing display of each separate obscene magazine to constitute a separate offense, separately punishable.

The maximum punishment fixed by the legislature for each offense is a $1,000 fine or imprisonment for up to six months—a penalty not so severe as to suggest to us a contrary intent….

*Randall*, 316 Md. at 329.

Thus, Payne argues that, "[t]o hold that the unit of prosecution for possessing child pornography, not selling it, distributing it or creating it is even smaller than the unit of prosecution for displaying pornography or obscenity for advertising, is 'illogical, unjust, [and] inconsistent with common sense should be avoided.'" (Quoting *Melton*, 379 Md. at 477. We emphasize, however, the significant difference between displaying mere adult pornography or obscenity *vis-à-vis* the possession of child pornography—the exploitation of a child victim.

A brief review of other Maryland cases reflects the prosecutorial discretion employed when determining the number of separate charges to file for possession of voluminous amounts of child pornography.

In *Moore v. State*, *supra*, Moore was charged and convicted of one count each for possession of child pornography and for the use of a computer to depict child pornography. 388 Md. at 449, 452. The unit of prosecution, which was not at issue on appeal, was one count for all the child pornography materials found in Moore's possession including computer printouts of images, floppy discs, and two hard drives that contained images and video clips. *Id*. at 450–52. The court merged the two counts for sentencing and imposed

32

a sentence of three years' incarceration for the use of a computer to depict child pornography. *Id*. at 452.

In *McIntyre v. State*, 168 Md. App. 504 (2006), McIntyre was convicted of 47 counts of possession and two counts of distribution of child pornography, but, for reasons not explained, the trial court only imposed a one-year sentence on one of the counts of possession, with no sentences on the remaining 46 counts, and merged the two distribution counts while imposing a three-year sentence with all but one-year suspended to run concurrently to the sentence on the possession count. 168 Md. App. at 509. On appeal, McIntyre did not challenge the unit of prosecution or his sentences. *Id*. at 509–10.

More recently, in *Fone v. State*, 233 Md. App. 88 (2017), Fone was charged with 10 counts of possession and 10 counts of distribution of child pornography for 10 images that he possessed and then sent via an online messenger service. 233 Md. App. at 97–98. For reasons not explained, the State entered a *nolle prosequi* on each of the 10 possession counts. *Id*. at 97. Fone was convicted of the 10 counts of distribution and sentenced to concurrent suspended five-year terms for each count. *Id*. at 93. Fone did not challenge the unit of prosecution or the sentences on appeal. *Id*. at 94.

In *Redkovsky v. State*, 240 Md. App. 252 (2019), this Court had the occasion to affirm the convictions for four counts of distribution of child pornography and four counts of possession of child pornography based on four videos downloaded by police from Redkovsky's computer using a peer-to-peer file-share program. 240 Md. App. at 254. The trial court sentenced Redkovsky to two consecutive ten-year sentences with all but six suspended on each for two of his distribution convictions and merged the remaining counts

33

for sentencing. *Id.* Again, neither the unit of prosecution nor the separate sentences were at issue on appeal.

### Federal Law

Payne suggests in passing that federal law provides support for his position. We disagree and find federal case law unhelpful in our analysis of the Maryland statute. The General Assembly's choice of language in Art. 27 § 419B and its successor, CR § 11-208, deviates substantially from that in the federal statute, which was enacted in 1996, four years after Maryland's possession statute.

The applicable federal statute provides, in relevant part:

(a) Any person who-- … (5) …

> (B) knowingly possesses, or knowingly accesses with intent to view, *any* book, magazine, periodical, film, videotape, computer disk, or any other material *that contains an image* of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer[.]

18 U.S.C.A. § 2252A(a)(5)(B) (emphasis added).

In contrast with the Maryland statute, the focus of the federal statute is the medium of the storage or presentation of any proscribed images or items enumerated. Notwithstanding its use of "any," the federal statute proscribes possession of any medium or device that "*contains*" child pornography. That distinguishes the federal statute from the Maryland statute, which prohibits possession of the item of child pornography, not the device or medium in which it might be stored or displayed.

34

## Other Jurisdictions

Payne also directs our attention to decisions of our sister states considering similar child pornography possession statutes. Submitting that there are differing results which support his position, he refers us to an extensive summary of appellate decisions from 12 other states as gathered by the Supreme Court of Nevada in *Castaneda v. State*, 373 P.3d 108, 113–14 (Nev. 2016). That summary, however, while instructive, fails to consider the specific language of the statute being interpreted in those respective decisions. We shall briefly review a sampling of those decisions, the current versions of each statute referenced, and supplement additional case law where helpful to our analysis.

Many of the relevant statutes considered in the case law discussed in *Castaneda*, used the term "any" in reference to the quantity of the material. Indeed, as *Castaneda* points out:

> The word "'any' has multiple, conflicting definitions, including (1) one; (2) one, some, or all regardless of quantity; (3) great, unmeasured, or unlimited in amount; (4) one or more; and (5) all." *State v. Sutherby*, 165 Wash. 2d 870, 880 (2009) (citing Webster's Third New International Dictionary 97 (1976)). … In fact, … "the word 'any' has 'typically been found ambiguous in connection with the allowable unit of prosecution,' for it contemplates the plural, rather than specifying the singular." *U.S. v. Coiro*, 922 F.2d 1008, 1014 (2d Cir.1991).

*Castaneda*, 373 P.3d at 111.

The Nevada possession statute under review in *Castaneda* provides:

> A person who knowingly and willfully has in his or her possession for any purpose *any film*, photograph or other visual presentation depicting *a person* under the age of 16 years as *the subject* of a sexual portrayal or engaging in or simulating, or assisting others to engage in or simulate, sexual conduct[.]

Nev. Rev. Stat. Ann. § 200.730 (emphasis added).

35

While the *Castaneda* Court determined that the possession statute was ambiguous because of the unqualified use of the term "any," *see* 373 P.3d at 111, a more recent case, *Shue v. State*, 407 P.3d 332 (Nev. 2017), held that Nevada's child pornography statute "plainly defines the proper unit of prosecution as each distinct minor who is the subject of a sexual portrayal in a performance." 407 P.3d at 336. The Court explained that "[i]n contrast to the word 'any,' the term 'a minor' under [the child pornography statute] plainly denotes the object of the offense in singular terms and necessarily precludes any contemplation of the plural." *Id.* Although upholding its finding in *Castaneda* of ambiguity in the possession statute's use of the term "any," the *Shue* Court's characterization of the unit of prosecution for Nevada's child pornography statute is helpful in our analysis. Like Nevada's child pornography statute, CR § 11-208(a) clearly refers to each subject in the singular with the use of "a" and "an"—first with, "[a] person," then by "a … visual representation," with "an actual child," and, in referring to the child, engaged as "a subject."

In *Rea v. State*, 474 S.W.3d 493 (Ark. 2015), the Supreme Court of Arkansas upheld four separate convictions of child exploitation and 20 counts of distributing, possessing, or viewing child pornography where separate sentences were imposed on each convicted violation. 474 S.W.3d at 495. The relevant portion of the Arkansas possession statute provides:

> (a) A person commits distributing, possessing, or viewing of matter depicting sexually explicit conduct involving a child if the person knowingly:

> * * *

36

(2) Possesses or views through *any* means, including on the Internet, *any* photograph, film, videotape, computer program or file, computer-generated image, video game, or *any* other reproduction that depicts a child or incorporates *the image* of a child engaging in sexually explicit conduct.

Ark. Code Ann. § 5-27-602(a)(2) (emphasis added). In assessing the proper unit of prosecution under the statute, the *Rea* Court explained that

> it criminalizes the possession of "any" of the proscribed items that are expressed in singular form. … In our view, the plain language of the statute demonstrates that the General Assembly unambiguously intends that each act of possession is a discrete and independent offense. Consequently, the statute authorizes separate convictions for each prohibited photograph and videotape that is possessed.

474 S.W.3d at 497.

That rationale was recently affirmed when applied to a similar statute containing the same qualifying language for receipt or distribution of child pornography in *Pelletier v. Kelley*, 561 S.W.3d 730, 734–35 (Ark. 2018). Similarly, in *Peterka v. State*, 864 N.W.2d 745 (N.D. 2015), the Supreme Court of North Dakota relied on its statute's use of singular language qualified by application of the term "any" to support the that the "legislature intended prosecution for each differing visual representation." 864 N.W.2d at 752. *See also Commonwealth v. Davidson*, 938 A.2d 198, 219 (Pa. 2007) (concluding that "all of the objects listed in the statute are singular, *e.g.*, a 'photograph' or a 'computer depiction,' meaning that each photograph or computer depiction constitutes a distinct occurrence of offensive conduct in violation …."); *Fink v. State*, 817 A.2d 781, 788 (Del. 2003) (concluding that use of the term "visual depiction" in the singular in the possession statute afforded "that each individual 'visual depiction' of child pornography that is knowingly …

37

possessed by a defendant constitutes the basis for a separate offense under the statutes"); *Williams v. Commonwealth*, 178 S.W.3d 491, 495 (Ky. 2005) (concluding that "[t]he singular form of 'photograph' read in conjunction with the term 'any' clearly indicates that the Legislature intended prosecution for each differing photograph.").

The Court of Appeals of Arizona applied its Supreme Court's holding that the "legislature intended these statutes to criminalize each image that constitutes child pornography because its very existence harms the victim it depicts." *State v. McPherson*, 269 P.3d 1181, 1184 (Ariz. Ct. App. 2012) (citing *State v. Berger*, 134 P.3d 378, 379 (Ariz. 2006)). The Arizona statute prohibits "'possessing … any visual depiction …," which is defined as "each visual image …."'" *McPherson*, 269 P.3d at 1184 (quoting Ariz. Rev. Stat. Ann. § 13-3553(A.)(2); § 13-3551(11) (2012)). *Accord State v. Ravell*, 922 A.2d 685, 687 (N.H. 2007) (reiterating that "'[t]he legislature intended the unit of prosecution to be each separate book, magazine, pamphlet, motion picture film, photograph, or picture'" (quoting *State v. Cobb*, 732 A.2d 425, 433–34 (N.H. 1999))); *Vineyard v. State*, 958 S.W.2d 834, 838 (Tex. Crim. App. 1998) (holding that "the Legislature intended in cases like this to make possession of each item of child pornography an 'allowable unit of prosecution'"); *Chapman v. Commonwealth*, 697 S.E.2d 20, 25 (Va. Ct. App. 2010) (consistent with the statute's proscription of "possession of a photograph," the Court of Appeals of Virginia explained that "'the Virginia legislature has demonstrated its clear intent that possession of a single photograph could constitute an offense under [the statute] and that multiple punishments would result from multiple violations of the statute'" (quoting *Mason v. Commonwealth*, 636 S.E.2d 480, 484 (Va. Ct. App. 2006))); *State v. Fussell*, 974 So. 2d

38

1223, 1238 (La. 2008) (concluding that the legislative intent was to afford "that one who intentionally possesses child pornography can be charged on a separate count, and sentenced separately for each count upon which he or she is convicted, for each child in each sexual performance captured within photographs, films, videotapes, and/or other visual reproductions that comprise the defendant's collection of child pornography").

Since *Castaneda,* some states have revised their statutes to clarify the intended unit of prosecution for possession of child pornography, leaving former holdings inapplicable. For example, in *State v. Liberty*, 370 S.W.3d 537 (Mo. 2012), the statute applicable at the time of the Supreme Court of Missouri's decision, proscribed, in relevant part, a "person [who] possesses any obscene material that has a child as one of its participants …." 370 S.W.3d at 547 (quoting Mo. Ann. Stat. § 573.037(1) (2009)). Subsequent amendments resulted in the current version of the statute which qualifies the class of felony based on the number of images, the smallest being "one still image," or the classification of the type of content, or a prior conviction. Mo. Ann. Stat. § 573.037(2) (2017). Further, the statute expressly provides that a person in violation "is subject to separate punishments for each item of child pornography or obscene material possessed by the person." Mo. Ann. Stat. § 573.037(3) (2017).

Similarly, in *State v. Sutherby*, 204 P.3d 916 (Wash. 2009), the 1990 version of the Washington possession statute provided that "'[a] person who knowingly possesses visual or printed matter depicting a minor engaged in sexually explicit conduct is guilty of a class C felony[,]'" and further defined "visual or printed material" using the term "any." 204 P.3d at 920 (quoting Wash. Rev. Code Ann. § 9.68A.070 (1990)). The current version of

the Washington statute provides, in relevant part, that "a person commits the crime of possession of depictions of a minor engaged in sexually explicit conduct in the first degree when he or she knowingly possesses a visual or printed matter depicting a minor engaged in sexually explicit conduct." Wash. Rev. Code Ann. § 9.68A.070(a)(1) (2019). Further, the statute clearly spells out that: "For the purposes of determining the unit of prosecution under this subsection, *each* depiction or image of visual or printed matter constitutes *a separate offense*." Wash. Rev. Code Ann. § 9.68A.070(c) (2019) (emphasis added).

In conclusion, we hold that each instance of possession of child pornography, as proscribed by CR § 11-208, is a discrete and independent offense and, therefore, subject to separate punishment.

Because, in this case, the evidence is clear that the five images upon which the prosecution was based are of five different children, we hold that where the charged possession involves offending images of different children, the unit of prosecution is each separate image. Accordingly, the five convictions and their corresponding sentences stand.

**JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED; COSTS ASSESSED TO APPELLANT.**

40

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/1649s17cn.pdf